**Isidore I. EPSTEIN and Seymour Malman, Plaintiffs,**

v.

**Herbert BROWNELL, Jr., Attorney General of the United States, Defendant.**

**Civ. A. 16556.**

United States District Court
E. D. New York.

Dec. 5, 1956.

Leon Malman, New York City, for plaintiffs.

Leonard P. Moore, U. S. Atty., Eastern Dist. of New York, Brooklyn, by Lloyd H. Baker, Asst. U. S. Atty., Brightwaters, N. Y., Dallas S. Townsend, Asst. Atty. Gen., James D. Hill, Walter T. Nolte, Samuel Z. Gordon, Washington, D. C., Phillip W. Knight, Attys., Office of Alien Property, for defendant.

BYERS, District Judge.

These are cross-motions for summary judgment under Rule 56, 28 U.S.C.A., and both sides correctly assert that it clearly appears that there are no issues of fact which require adjudication.

The plaintiffs seek judgment against the defendant in the sum of $19,883.02 with interest from January 24, 1956; this is the amount paid by them for New York City real estate taxes and interest, levied against certain property in the Borough of Richmond, which the plaintiffs purchased from the defendant, pursuant to the terms of their written offer dated July 29, 1955 which was accepted in writing for the defendant under date of August 3, 1955.

These two instruments are duly pleaded and their terms are not in dispute. The controversey is over their legal effect, in view of matters to be explained.

There are before the court on these motions not only the pleadings but the affidavits of Oliver E. Nickerson (October 3, 1956) and Guy T. Reid (October 22, 1956) submitted on behalf of the defendant; and of Isidore I. Epstein (November 5, 1956) and Leon Malman (November 8, 1956) submitted for the plaintiffs. Epstein is one of the plaintiffs and in his affidavit describes himself thus:

"I am a member of the Bar of the State of New York, though not in active practice, but engaged in the real estate business;"

the deponent Malman is the attorney of record for the plaintiffs.

The undisputed facts are to be thus summarized:

The real estate consists of three parcels completely described in the offer to purchase constituting Exhibit A attached to the defendant's motion papers. The descriptions are not literally the same in the indenture, being the quit claim deed hereinafter referred to, which is Exhibit D attached to the same papers, but there is no question raised on this motion concerning the extent or boundaries of the property, and thus a detailed description by metes and bounds is not required as part of this decision.

The taxes in question seem to have been assessed during the period commencing November 19, 1942, and as at March 5, 1956, amounted with interest and penalties to the sum of $19,883.02. The figures are broken down in the affidavit of Leon Malman above referred to, as follows:

Lot 1*
| | |
|---|---|
| Second half, 1942/1943 to 1953/1954 | $15,682.85 |
| Second half, 1953/1954 to 1954/1955 | 1,755.19 |
| First half, 1955/1956 | 851.59 |

Lot 275*
| | |
|---|---|
| Second half, 1942/1943 to 1953/1954 | 1,317.10 |
| Second half, 1953/1954 to 1954/1955 | 151.03 |
| First half, 1955/1956 | 75.26 |
| Total | $19,833.02 |

The devolution of title on the part of the defendant as successor to the Alien Property Custodian was as follows:

---

* (It is assumed that the lot numbers given above have to do with the entire property according to the description contained in the quit claim deed.)

Title was formerly in The Ultra Corporation, a New York corporation whose entire capital stock consisted of 200 shares, which was the subject of Vesting Order No. 393 dated December 29, 1942, issued by the then Alien Property Custodian, as enemy owned; ownership continued in the corporation until April 14, 1953 when it was conveyed and assigned to the Attorney General as the successor to the Alien Property Custodian pursuant to Dissolution Order No. 100 issued by the Attorney General under date of March 27, 1953. The directors of the said corporation, pursuant to the provisions of the said Vesting Order, were the nominees of the Alien Property Custodian.

The Nickerson affidavit recites that the property had been on the market for approximately ten years prior to the month of July, 1955, "but the Office of Alien Property and its predecessor in title received few offers for the purchase of the property inasmuch as the outstanding taxes on the property were substantial and, apparently, because the property was in a rather isolated location."

Seemingly the approval of the proposed bridge from Brooklyn to Staten Island in April of 1955 indicated the possibility of a sale, and on July 14, 1955 the defendant caused newspaper advertisements to appear in the Brooklyn Spectator, the New York Times and the Staten Island Advance, soliciting sealed bids, and subsequently thereto, namely under date of July 29, 1955, such bids having been received, were opened at 2:00 P. M. in the office of James J. Burke, 7425 Amboy Road, Tottenville, Staten Island, New York.

On that occasion, Nickerson announced in the presence of sixteen other persons including these plaintiffs and other bidders, the terms of sale; his affidavit states:

"I specifically referred to the fact that all bids on the property in question were submitted subject to any unpaid taxes, interest and penalties against the property. At that time I referred, in the presence of all those in attendance, to correspondence I had received from the Tax Office of the City of New York in reference to the taxes charged against the property upon which bids were being received. The attention of the assembled bidders was called to the amount of taxes, interest and penalties in arrears on said property which was approximately $20,000. A discussion ensued between the bidders and myself for approximately fifteen minutes during which time I answered all questions submitted. All this occurred before the bids were opened.

"I observed the presence of Mr. Isidore I. Epstein and Mr. Seymour Malman during the entire course of the discussion in which I had pointed out the substantial New York City taxes in arrears on the property and in which I had explained that the successful bidder would have to pay all unpaid taxes, interest and penalties on the property.

"Mr. Epstein and Mr. Malman did not attempt to withdraw their bid or object to going forward with the opening of bids. I then opened the bids and the bid of Messrs. Malman and Epstein (a true photostatic copy of which is hereby attached as Exhibit A and made a part thereto) was the highest."

The affidavits of Isidore I. Epstein and Leon Malman do not deny the foregoing. In the Epstein affidavit it is stated:

"At no time did Mr. Nickerson ever state that bids could be withdrawn. No indication whatsoever was ever given by him that any person not satisfied with his bid or with any of the other terms of the sale could withdraw his bid."

Malman's affidavit merely avers that what Nickerson may have told the persons present at the bidding is entirely incompetent, and entitled to no consideration whatsoever on these motions.

Attention is thus drawn to the terms of the bid submitted by these plaintiffs constituting the said Exhibit A of the defendant's motion now before the court, which recites the offer to purchase from the Attorney General "all his right, title and interest in and to the real property" etc., and then follows the descriptions of the three parcels, and interests appurtenant thereto, subject to a certain right of way, and the sum offered is $17,500, which is known as the purchase price, of which 10% is deposited as earnest money; there is a provision that the Attorney General shall have 30 days from the date thereof within which to accept this offer, and in the event of nonacceptance, the earnest money shall be returned.

An alternative clause deals with the failure, in the event of acceptance, on the part of the purchaser to pay the balance of the purchase price. Title is to be conveyed by quit claim deed without covenants or warranty and with a reservation not presently pertinent; the offer of purchase contains the following:

"The sale is to be made subject to all unpaid taxes and assessments, if any, which have accrued against the property, and all other costs, including, without limitation, title search and recording shall be borne by the offeror.

"No representations or implied warranties have been made to the offeror by the Attorney General or by anyone, purporting to act in his behalf relative to the condition of said real property."

The remaining provisions have to do with the closing of title and notice of acceptance which is to be given by mail.

Attached to the offer are affidavits verified July 29 and August 1, 1955, respectively, by Seymour Malman and Isidore I. Epstein, the plaintiffs. These affidavits contain statements to induce the acceptance of the offer.

Under date of August 3, 1955 and by registered mail, the defendant accepted the said offer of $17,500.00, from which the following is quoted:

"You are hereby notified of such acceptance and that the undersigned, acting for the Attorney General, is now ready to consummate the sale of all the right, title and interest of the Attorney General in and to the said real property (amounting to about 49 acres) to you upon the terms and conditions of the contract resulting from said offer and the said acceptance thereof."

Means are suggested to arrange for an appointment to consummate the sale.

It appears that the closing date was extended to December 1, 1955.

The quit claim deed appears as stated and recites the basis of the defendant's title, the advertising for sealed bids, and the submission by the plaintiffs of their bid for $17,500.00 which was said to be the highest offer received, and the acceptance thereof. Appropriate clauses of conveyance follow with a comprehensive habendum clause, and the final paragraph of the instrument reads:

"It is hereby expressly provided and by accepting this Indenture of conveyance the parties of the second part (these plaintiffs) agree that this Indenture is made without covenants or warranties of any kind, and that no representations or implied warranties have been made to them by the Attorney General or by anyone purporting to act in his behalf."

When the $17,500.00 was paid at the closing, payment was accomplished by a check for the balance due, which contained on its reverse side the following:

"Payment in full of balance due on purchase of tract of land in Borough of Richmond, City of New York, but reserving to purchasers all rights which they may have by reason of the non-payment of real estate taxes on the tract, and interest and penalties thereon, since 7/1/42."

It is apparent that the relationship of the parties now under examination rested entirely in contract, and if the plaintiffs' claim for relief is understood, it amounts to an assertion that the contract must be deemed to have embraced an implied assurance that real estate taxes which accrued against the property from and after the date of vesting under the Vesting Order, had been paid; or if not, that the amount thereof would be credited against the purchase price.

Such seems to be the necessary meaning of the following paragraph of the complaint:

"Sixteenth: It was an implied term of the contract thereby created that defendant had complied, or would prior to the passage of title comply, with the aforesaid dissolution order and with all applicable statutory requirements and specifically with Section 36(b) of the Trading With the Enemy Act [50 U.S. C.A.Appendix, § 36(b)]."

An earlier allegation reads:

"Fourteenth: On or about July 29, 1955 plaintiffs offered to buy Tract A from defendant, in the light of the aforesaid statute."

Just what the foregoing means in the legal sense is not clear to this court, but apparently the plaintiffs assert that something should be read into the written contract which is not there, and that the defendant should be held liable for a breach of the absent provisions.

It will be apparent from the foregoing recital that there was no attempt made between July 29, 1955 when the plaintiffs' bid was opened, and January 24, 1956, which seems to have been the date of closing of title, to secure equitable relief by way of rescission, or reformation of the contract so as to embrace the alleged implied term of the contract referred to in Paragraph Sixteenth of the complaint.

Instead plaintiffs accepted the conveyance which has been described, containing the recital above quoted as to the absence of covenants or "warranties of any kind" or "representations or implied warranties."

The plaintiffs seek to avoid the impact of the provision in their bid to the effect that the contemplated sale was to be made "subject to all unpaid taxes and assessments, if any, which have accrued against the property, * * *" by arguing that they were justified in relying upon an assumption that the authority to pay taxes pursuant to the provisions of the Trading With the Enemy Act, 50 U.S.C.A.Appendix, § 36(b) had been exercised by the defendant as successor to the Alien Property Custodian.

The statutory provision may be quoted in part:

"The Alien Property Custodian shall, notwithstanding the filing of any claim or the institution of any suit under this Act, * * * pay any tax incident to any such property or interest * * * at the earliest time appearing to him to be not contrary to the interest of the United States. * * * No tax liability may be enforced from any property or interest or the earnings, increment, or proceeds thereof while held by the Alien Property Custodian except with his consent. Where any property or interest is transferred, otherwise than pursuant to section 9(a) or 32 hereof, * * * the Alien Property Custodian may transfer the property or interest free and clear of any tax, except to the extent of any lien for a tax existing and perfected at the date of vesting, and the proceeds of such transfer shall, for tax purposes, replace the property or interest in the hands of the Alien Property Custodian."

Plaintiffs' argument is that the word "shall" first above quoted is mandatory, although such a construction would seem not to be consistent with the closing provisions of the sentence in which the word "shall" appears. If it is necessary to the decision of this case—

which I do not deem it to be—the provision as a whole should be held to be permissive rather than mandatory.

■ Even if this is not so, and the plaintiffs' argument were deemed to be sound, the omission to pay taxes would in no wise affect the capacity of the defendant to contract to sell the property "subject to all unpaid taxes and assessments, if any, which have accrued against the property."

Defendant's brief argues convincingly that the purpose of the pertinent provisions of the Act was to render property held by the Alien Property Custodian on behalf of the United States subject to local taxation, as though privately owned, for reasons it is not necessary now to expound. The method of meeting that tax liability was left to the selection of the Alien Property Custodian.

Title to this property having vested in the United States, it could be conveyed to a purchaser according to the terms of a written contract such as is here present. Nothing has been pleaded or otherwise shown to justify the entry of a judgment which could be based only on a contract into which the parties did not enter.

The result of this reasoning is thought to be in accordance with the requirements of justice between these litigants. Whether there is any true difference between "a claim for relief" and "a cause of action" may provide an occasional subject for disputation, but clearly the former must be something more than an expressed desire on the part of one party that the other should pay him money, if it is to expose any real legal substance.

■ This complaint does not survive the test.

There was nothing clandestine in the assessment of these taxes by the City of New York; not only were the plaintiffs chargeable with notice of what the tax records proclaimed, but since the plaintiff Epstein deposes that he is engaged in the real estate business, it is a reasonable inference that before the bid of the plaintiffs was submitted, he examined into the tax situation before formulating any bid for so large a parcel as 49 acres of property; not only that, but both of the plaintiffs had actual notice at the opening of bids of the approximate amount of unpaid taxes, in the face of which they did not withdraw their bid, or ask for an opportunity to recompute it.

Neither party has cited any decision construing the aspect of the Trading With the Enemy Act here involved, with respect to the nature and extent of the responsibility of the Alien Property Custodian concerning local taxes. Under date of November 23, the attorney for the plaintiffs sent to the court a quotation from page 87 of the Annual Report of the Office of Alien Property, Department of Justice, for the fiscal year ending June 30, 1947. At most, the quotation is a comment which is deemed not to be inconsistent with the construction of the statute herein adopted.

This decision therefore is reached strictly on the facts here presented, and as a matter of principle.

Defendant's motion for summary judgment is granted; plaintiffs' cross-motion denied.

Settle order.